UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

**ANTHONY RAMSEY,**
    Plaintiff,

v.

**CHICAGO TRANSIT AUTHORITY,**
a public body and municipal corporation;
**VAN JOHNSON,**
individually and in his official capacity;
**MUTIUT WILLIAMS,**
individually and in his official capacity; and
**JULIE AFFRICK,**
individually and in her official capacity,
    Defendants.

---

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**
**(42 U.S.C. Section 1983)**
**JURY TRIAL DEMANDED**

**INTRODUCTION**

Anthony Ramsey gave twenty-six years of his career to the Chicago Transit Authority. He rose through the ranks on merit alone, earning the position of Senior Manager of Rail Station Management, a demanding leadership role responsible for overseeing rail station operations across CTA's system. He was so trusted and respected that CTA selected him for an elite management development program that admitted only twelve employees out of hundreds of applicants. In twenty-six years of service, he never received a written warning. He never missed a day of work while in management. By every measure, his record was exemplary.

In July 2023, without advance notice and without being told why, CTA compelled Mr. Ramsey to appear before an investigator from the Office of the Executive Inspector General. He

1

was told attendance was mandatory. He was not told what the meeting was about. He was not advised of his right to remain silent. He was not told that anything he said could be used against him in a disciplinary proceeding. He was not given the opportunity to consult with an attorney or a representative of any kind. He answered the investigator's questions because he understood, with good reason, that his job depended on his cooperation. He felt intimidated. His statements were compelled in clear violation of his constitutional rights under *Garrity v. New Jersey*, 385 U.S. 493 (1967). He was never given a Garrity warning.

For the next eight months, CTA was silent. Mr. Ramsey received no report, no findings, no charges, no written notice of any kind. Then, in February 2024, he was summoned to a meeting with CTA's Director of Labor Relations and his Vice President. Again, there was no advance written notice, no statement of purpose, no charges, and no opportunity to respond. After that meeting, CTA was silent again.

Then came April 12, 2024. Van Johnson, CTA's Director of Labor Relations, placed a Zoom call to Mr. Ramsey. There was no advance notice. There was no written agenda. On that call, Johnson told Mr. Ramsey he was being discharged. When Mr. Ramsey asked why - the most basic question any employee has the right to ask - Johnson told him flatly that he did not have to provide that information. Johnson then offered a choice: resign, and CTA would not contest his unemployment benefits; or be fired. Mr. Ramsey had to decide, immediately, on that call. He had no attorney. He had no information. He resigned.

What happened to Anthony Ramsey was not a lawful termination. It was a cascade of constitutional violations. He was denied every protection the Fourteenth Amendment guarantees to public employees before they can be stripped of a property interest in their livelihood: notice of the charges against them, an explanation of the evidence, and a meaningful opportunity to tell their

side of the story. The Supreme Court made these requirements clear more than forty years ago. CTA treated them as optional.

The injustice is compounded by CTA's treatment of others in identical circumstances. Three upper-level CTA managers also received Paycheck Protection Program loans during the same period: Tonisha Johnson Chambers, General Manager of the Control Center; Branden Davis, Manager of the Control Center; and Robbie Brown, Manager of the Control Center. Some of their loans equaled or exceeded Mr. Ramsey's. They were allowed to repay the money and keep their jobs. Mr. Ramsey was not. A separate CTA employee, Jake Peavy, who was terminated after Mr. Ramsey, was subsequently reinstated. Mr. Ramsey was not.

Anthony Ramsey brings this action to vindicate rights the Constitution has guaranteed him for decades, to be reinstated to the career he built over twenty-six years, and to be made whole for the harm that CTA's unlawful conduct has caused him and his family.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over this action pursuant to 28 U.S.C. Sections 1331 and 1343(a)(3), as this action arises under the Constitution of the United States and 42 U.S.C. Section 1983.

2. Venue is proper in this district pursuant to 28 U.S.C. Section 1391(b) because all Defendants are located in the Northern District of Illinois and all events giving rise to Plaintiff's claims occurred within this district.

3

## PARTIES

3.  Plaintiff **Anthony Ramsey** is a resident of Cook County, Illinois. At all relevant times, he was employed by the Chicago Transit Authority as Senior Manager of Rail Station Management.

4.  Defendant **Chicago Transit Authority** ("CTA") is a public body and municipal corporation organized and existing under the laws of the State of Illinois, with its principal offices located in Chicago, Illinois. At all relevant times, CTA acted under color of state law within the meaning of 42 U.S.C. Section 1983.

5.  Defendant **Van Johnson** was, at all relevant times, employed by CTA in a senior supervisory and decision-making capacity, with authority over personnel decisions including employee discipline and termination. He is sued in both his individual and his official capacities.

6.  Defendant **Mutiut Williams** was, at all relevant times, employed by CTA as Vice President of Rail Station Management, with direct supervisory authority over Mr. Ramsey. He is sued in both his individual and his official capacities.

7.  Defendant **Julie Affrick** was, at all relevant times, employed by or assigned to the Office of the Executive Inspector General ("OEIG"), and conducted the investigative interview of Mr. Ramsey in July 2023. She is sued in both her individual and her official capacities.

## FACTUAL ALLEGATIONS

### A.  Anthony Ramsey's Twenty-Six-Year Career at CTA

8.  Anthony Ramsey began his employment with the Chicago Transit Authority approximately twenty-six years before his separation in April 2024.

4

9. Over the course of his career, Mr. Ramsey rose through CTA's ranks on merit, ultimately attaining the position of Senior Manager of Rail Station Management, a senior leadership role responsible for the management and oversight of CTA's rail station operations.

10. Throughout his twenty-six-year career, Mr. Ramsey never received a written warning, a performance improvement plan, a formal reprimand, or any other form of disciplinary action. His personnel record was without blemish.

11. CTA itself recognized Mr. Ramsey's excellence. He was selected to participate in CTA's elite management development program, a competitive program for which hundreds of CTA employees applied and from which only twelve were selected. He was widely respected by his colleagues and subordinates and was viewed as a candidate for promotion to a General Manager position.

12. At the time of his separation, Mr. Ramsey was a fully tenured CTA employee. He was not in any probationary status.

13. Mr. Ramsey's annual salary at the time of his separation was $135,000. He received a comprehensive package of employment benefits, including pension contributions, health insurance, deferred compensation, and transit benefits.

**B. The PPP Loans**

14. In March and April 2021, during the height of the COVID-19 pandemic, Mr. Ramsey applied for and received two Paycheck Protection Program ("PPP") loans in the amount of $20,833 each, totaling $41,666. The loans were obtained in connection with a sole proprietorship through which Mr. Ramsey transported individuals to jails and casinos. At

the time, his mortgage obligations had increased substantially, and the PPP loans were intended in part to help him meet those obligations.

15. CTA had a policy addressing disclosure of outside business interests. However, the policy's application to self-employment, as distinguished from employment with a separate company, was not clear to Mr. Ramsey. He did not believe that the policy required him to disclose his sole proprietorship or the PPP loans, and he did not disclose them to CTA.

16. The PPP loans were forgiven.

17. As set forth in greater detail below, at least three other CTA managers received PPP loans during the same general period, in amounts equal to or exceeding Mr. Ramsey's total. Those individuals were permitted to resolve the matter with CTA and retain their employment. Mr. Ramsey was not.

**C. The OEIG Interview: Compelled Statements Without Constitutional Warnings (July 2023)**

18. In July 2023, Mr. Ramsey was contacted by Defendant Julie Affrick of the OEIG regarding his receipt of the PPP loans.

19. Mr. Ramsey was told that his attendance at and participation in the OEIG interview were mandatory.

20. Before and during the interview, no one advised Mr. Ramsey: (a) that he had the right to remain silent; (b) that his statements could or would be used against him in a disciplinary proceeding; or (c) that he had the right to have an attorney or a union representative present before answering questions. No *Garrity* warnings of any kind were provided.

21. Mr. Ramsey was not represented by any attorney or other representative during the OEIG interview.

22. Mr. Ramsey answered the investigator's questions because he understood that his continued employment depended on his cooperation. He felt intimidated throughout the interview.

23. Mr. Ramsey was given no written notice before the interview identifying the subject matter of the inquiry, the purpose of the investigation, or any rights he held as a public employee.

24. After the interview, OEIG never provided Mr. Ramsey with any written report, findings, conclusions, notice of charges, or other documentation. He left the interview with less information about his situation than when he arrived.

**D. The February 2024 Meeting: No Notice, No Charges, No Opportunity to Respond**

25. In February 2024, approximately seven months after the OEIG interview and without any intervening communication, Mr. Ramsey was summoned to a meeting with Defendants Van Johnson and Mutiut Williams.

26. Mr. Ramsey received no written notice before the meeting identifying its purpose or agenda.

27. At the February 2024 meeting, no findings, allegations, charges, or evidence were presented to Mr. Ramsey.

28. Mr. Ramsey was given no opportunity to respond to or rebut any allegations at the February 2024 meeting.

29. Mr. Ramsey was not represented by any attorney or other representative at the February 2024 meeting.

30. No written documentation of any kind was provided to Mr. Ramsey before, during, or after the February 2024 meeting.

**E. The April 12, 2024 Termination: An Ultimatum Without Due Process**

31. On April 12, 2024, Defendant Van Johnson initiated a Zoom call with Mr. Ramsey. Mr. Ramsey received no advance written notice of the call, its purpose, or its agenda.

32. Mr. Ramsey was not represented by any attorney or other representative on the call.

33. During the call, Johnson informed Mr. Ramsey that CTA was moving forward with his discharge.

34. Mr. Ramsey asked Johnson to state the reason for his discharge. Johnson responded that he did not have to provide that information.

35. Johnson then gave Mr. Ramsey two options: resign, in which case CTA would not contest his application for unemployment benefits and there would be nothing negative on his employment record; or be terminated, in which case CTA would contest his unemployment benefits.

36. Mr. Ramsey was required to make this decision immediately, on the call, without time to consult with an attorney or any other advisor. He had received no prior written notice that this call would occur. He had no information about the charges against him. He had never been given an opportunity to respond.

37. Facing the immediate loss of his livelihood, his pension, his ability to provide for his family, and the risk of damage to his permanent employment record, Mr. Ramsey resigned. He signed resignation paperwork on April 12, 2024.

38. At no point before, during, or after the April 12 call did CTA provide Mr. Ramsey with any written charges, any statement of the evidence against him, any investigative report or findings, or any other documentation identifying the basis for his termination.

39. At no point during the entire process from July 2023 through April 2024 - spanning nine months, two compelled meetings, and a coerced resignation - was Mr. Ramsey given a meaningful opportunity to hear the charges against him and respond before a decision-maker with authority to act on what he said.

### F. CTA Broke Its Promise on Unemployment Benefits

40. Despite Johnson's explicit representation on April 12 that CTA would not contest Mr. Ramsey's unemployment benefits if he resigned, CTA initially contested his application. Mr. Ramsey was denied.

41. Mr. Ramsey was forced to contact Van Johnson directly and document the promise Johnson had made as a condition of his resignation. Only after Mr. Ramsey sent Johnson an email recounting that representation did CTA relent. His unemployment application was then approved.

### G. The OEIG's Statutory Obligations and the Significance of Their Breach

42. The OEIG has exercised jurisdiction over CTA since July 1, 2011, when the Illinois General Assembly extended the OEIG's authority to include the Regional Transit Boards, among them CTA. In December 2011, the OEIG established a dedicated division to investigate allegations of misconduct at CTA, Metra, the RTA, and Pace. The OEIG's jurisdiction and investigative procedures are governed by the State Officials and Employees Ethics Act, 5 ILCS 430, and the Illinois Administrative Code.

43. The Ethics Act imposes mandatory obligations on the OEIG with respect to the subjects of its investigations. At the conclusion of an investigation, if the OEIG determines that reasonable cause exists to believe a violation occurred, it must issue a summary report to

9

the appropriate ultimate jurisdictional authority and to the head of each agency involved. 5 ILCS 430/20-50(a). If the OEIG determines that there is insufficient evidence of a violation, it must issue a written statement of its decision to close the matter to the Executive Ethics Commission. 5 ILCS 430/20-51. If a subject of an investigation requests a written statement of closure based on insufficient evidence, the OEIG is required to provide that statement to the subject. Id.

44. Mr. Ramsey never received any communication from the OEIG following his July 2023 interview. He received no summary report, no written closure statement, no notice of findings, and no written statement that the investigation had been closed for insufficient evidence. He received nothing. This silence was itself a violation of the OEIG's statutory obligations and left Mr. Ramsey entirely in the dark about the status, findings, and conclusions of the investigation that was being used as the stated basis for his termination.

45. The OEIG's complete silence gives rise to two equally damaging inferences for Defendants. Either the OEIG found insufficient evidence of any violation and closed the case without informing Mr. Ramsey, in which case CTA terminated a twenty-six-year employee in the absence of any factual finding supporting discipline; or the OEIG made findings that it never disclosed to Mr. Ramsey or gave him any opportunity to contest, in which case CTA used undisclosed investigative conclusions as the hidden basis for a termination that denied Mr. Ramsey any opportunity to know and respond to the case against him. Either inference confirms the constitutional deprivations at the heart of this case.

46. OEIG investigative records are confidential under the Ethics Act and are exempt from disclosure under the Illinois Freedom of Information Act. 5 ILCS 430/20-95(d). However,

those records are fully subject to federal civil discovery, including subpoena in this proceeding. Plaintiff intends to seek the complete OEIG investigative file, all communications between the OEIG and CTA concerning Mr. Ramsey, and all records relating to the OEIG's treatment of the comparator managers identified herein.

47. Upon information and belief, the OEIG has applied inconsistent investigative standards and procedures in connection with PPP loan inquiries involving CTA employees. Specifically, upon information and belief, the OEIG did not subject similarly situated CTA managers who received PPP loans to the same investigative process it applied to Mr. Ramsey, did not compel those employees to submit to mandatory interviews without constitutional warnings, and did not recommend or support adverse employment action against them. This inconsistency in the OEIG's application of its own investigative authority supports both the equal protection violation alleged herein and the inference that the investigation of Mr. Ramsey was conducted selectively and without adequate procedural basis. The full scope of the OEIG's inconsistent conduct will be established through discovery of the OEIG's investigative files and communications.

**H. CTA's Differential Treatment of Similarly Situated Employees**

48. At least three other CTA managers also received Paycheck Protection Program loans during 2021. Those individuals are: Tonisha Johnson Chambers, who held the position of General Manager of the Control Center; Branden Davis, who held the position of Manager of the Control Center; and Robbie Brown, who held the position of Manager of the Control Center.

49. Tonisha Johnson Chambers received a PPP loan of approximately $20,833 - equal to each of Mr. Ramsey's two loans. Branden Davis received a PPP loan of approximately $40,666

- equal to Mr. Ramsey's combined total. The exact amount received by Robbie Brown is not known to Mr. Ramsey at this time and is subject to confirmation through discovery.

50. Upon information and belief, Tonisha Johnson Chambers, Branden Davis, and Robbie Brown were not subjected to compelled OEIG interviews without constitutional warnings. They were not presented with resign-or-be-fired ultimatums. They were not denied any opportunity to respond to the allegations against them. They were permitted to resolve the matter and retain their positions at CTA.

51. Additionally, a CTA employee named Jake Peavy, who was terminated after Mr. Ramsey, was subsequently reinstated to his position at CTA. Mr. Ramsey was not offered reinstatement.

52. CTA's decision to force Mr. Ramsey's resignation while permitting comparably situated employees to retain their employment was without rational basis and without any legitimate governmental justification.

### I. Damages

53. As a direct and proximate result of Defendants' unconstitutional conduct, Mr. Ramsey has suffered and continues to suffer substantial harm:

(a) Loss of employment at a salary of $135,000 per year, together with the full value of his employment benefits, including pension contributions, health insurance, deferred compensation, and transit benefits;

(b) Forced early withdrawal of pension funds he had accumulated over twenty-six years of service, necessitated by the loss of his income. Mr. Ramsey had a mortgage, a

child in private school, and other financial obligations that he could not meet without drawing down his pension - a resource he should not have had to touch for years;

(c)  Out-of-pocket health insurance replacement costs of approximately $2,000;

(d)  Loss of the opportunity to be considered for and appointed to a General Manager position, a role for which Mr. Ramsey had been preparing and for which he was recognized as a candidate;

(e)  Loss of accrued vacation time and other employment entitlements;

(f)  Severe emotional distress, humiliation, and damage to his professional reputation arising from being forced out of a position he had held with distinction for twenty-six years, without being told why and without being given any opportunity to defend himself; and

(g)  Attorney's fees and costs incurred in vindicating his constitutional rights.

54.  Mr. Ramsey is currently employed as a Station Manager at Amtrak's Union Station at an annual salary of materially less than his CTA compensation, exclusive of the substantial benefits he has permanently lost.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF PROCEDURAL DUE PROCESS
**Fourteenth Amendment to the United States Constitution**
**42 U.S.C. Section 1983**
*Against All Defendants*

49.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

50. The Fourteenth Amendment to the United States Constitution prohibits the government from depriving any person of a property interest without due process of law.

51. Mr. Ramsey had a protected property interest in his continued employment with CTA. That interest rests on three independent and reinforcing grounds:

   a) First, Mr. Ramsey's twenty-six years of fully tenured, unblemished service created a legitimate expectation of continued employment that constitutes a property interest entitled to constitutional protection. *Board of Regents v. Roth*, 408 U.S. 564 (1972). CTA is a public body and municipal corporation created by statute under the Metropolitan Transit Authority Act, 70 ILCS 3605. Its senior management employees, particularly those with decades of tenured service and unblemished records, hold their positions in an institutional context that generates reasonable expectations of continued employment absent legitimate cause for termination.

   b) Second, CTA maintains internal management employee personnel policies and corrective action procedures governing discipline and termination of its non-union management staff. Those policies are not publicly available and will be produced in discovery. They are expected to confirm that management employees at Mr. Ramsey's level may be discharged only for cause and only following established disciplinary procedures. This pleading will be amended to incorporate the specific provisions of those policies once they are produced.

   c) Third, CTA's own conduct independently forecloses any argument that Mr. Ramsey was an at-will employee subject to summary discharge. An employer does not initiate a formal inspector general investigation, convene multiple senior-level meetings over nine months, and present a resign-or-be-fired ultimatum unless it has

concluded that cause is required to justify termination. CTA deployed the full machinery of a for-cause termination process. It cannot now disclaim the constitutional obligations that process triggers. A government employer cannot invoke the architecture of for-cause discipline and simultaneously deny the due process protections that architecture requires.

52. The minimum protections the Due Process Clause requires before a public employee may be deprived of a property interest in employment are: (a) oral or written notice of the charges; (b) an explanation of the employer's evidence; and (c) an opportunity for the employee to tell his side of the story. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546 (1985). These protections exist precisely to guard against the risk of erroneous deprivation - to ensure that an employer has not made a mistake before it takes an irreversible employment action.

53. Defendants denied Mr. Ramsey each and every one of these constitutionally required protections:

(a) Mr. Ramsey was never provided with written charges or a statement identifying the specific allegations against him;

(b) Mr. Ramsey was never provided with any explanation of the evidence on which CTA relied in deciding to terminate his employment. When he asked for that explanation on April 12, 2024, Johnson explicitly refused to provide it;

(c) Mr. Ramsey was never given a hearing or any other meaningful opportunity to respond to any charges before the termination decision was communicated to him and implemented; and

(d) The April 12, 2024 Zoom call was not a constitutionally adequate hearing. It was an ultimatum delivered after the decision had been made, presented to an unrepresented employee who had never been told the charges against him, and who was required to respond immediately under economic duress. That is not process. That is the absence of process.

54. Mr. Ramsey's resignation was not voluntary. It was coerced by the presentation of an ultimatum, without prior notice, without representation, and without any information about the charges or evidence against him. A resignation obtained under these circumstances is a constructive termination for purposes of constitutional analysis.

55. Defendants' conduct was taken under color of state law and deprived Mr. Ramsey of his constitutionally protected property interest in continued employment without due process of law, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. Section 1983.

56. As a direct and proximate result of Defendants' violations of Mr. Ramsey's due process rights, he has suffered the damages described above and is entitled to reinstatement, back pay, compensatory damages, attorney's fees under 42 U.S.C. Section 1988, and all other appropriate relief.

**COUNT II**
**VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS**
**COMPELLED STATEMENTS USED AS BASIS FOR TERMINATION**
*Garrity v. New Jersey, 385 U.S. 493 (1967)*
**42 U.S.C. Section 1983**
*Against Defendants Chicago Transit Authority and Julie Affrick*

57. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

58. The Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, prohibits the government from compelling a public employee to choose between self-incrimination and the loss of employment, and from using statements obtained under that coercion as the basis for termination. *Garrity v. New Jersey*, 385 U.S. 493 (1967).

59. Before a public employer may conduct an investigative interview of a public employee that will be used in connection with potential discipline, the employee must be advised: (a) that he has the right to remain silent; (b) that anything he says may be used against him in disciplinary proceedings; and (c) that, notwithstanding the potential use of his statements, his refusal to answer questions may result in discharge for insubordination. These warnings are constitutional prerequisites, not procedural formalities.

60. Mr. Ramsey was told his attendance at and participation in the July 2023 OEIG interview were mandatory.

61. None of the constitutionally required warnings were provided to Mr. Ramsey before or during the interview. He was not told he had the right to remain silent. He was not told his statements could be used against him in a disciplinary proceeding. He was not told he had the right to have counsel present.

62. Mr. Ramsey answered the investigator's questions because he believed his employment depended on his cooperation. He felt intimidated. His statements were compelled within the meaning of *Garrity v. New Jersey* and its progeny.

63. Upon information and belief, the compelled statements Mr. Ramsey made during the OEIG interview were used, in whole or in part, as the basis for the decision to force his resignation. CTA initiated no adverse employment action against Mr. Ramsey before the interview. The sequence of events - compelled interview, followed nine months later by termination - establishes the causal connection.

64. The use of Mr. Ramsey's constitutionally compelled statements as the basis for his termination, without affording him the protections *Garrity* requires, violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. Section 1983.

65. As a direct and proximate result of Defendants' *Garrity* violations, Mr. Ramsey has suffered the damages described above and is entitled to reinstatement, back pay, compensatory damages, attorney's fees under 42 U.S.C. Section 1988, and all other appropriate relief.

## COUNT III
### VIOLATION OF THE EQUAL PROTECTION CLAUSE
**Fourteenth Amendment to the United States Constitution**
**42 U.S.C. Section 1983**
*Against All Defendants*

66. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

67. The Equal Protection Clause of the Fourteenth Amendment prohibits the government from treating similarly situated individuals differently without a rational basis for doing so. *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

18

68. Mr. Ramsey and the comparator employees - Tonisha Johnson Chambers, Branden Davis, and Robbie Brown - were similarly situated in all material respects: all were CTA managers, all received PPP loans during the same general period, all were subject to the same CTA policies governing outside business interests and financial disclosures, and all were subject to the same investigative jurisdiction of the OEIG.

69. Despite being similarly situated, Defendants treated Mr. Ramsey fundamentally differently from these comparators. The comparator employees were allowed to retain their positions. Mr. Ramsey alone was subjected to a compelled interview without constitutional warnings, a series of meetings at which he was given no information and no opportunity to respond, and an ultimatum that coerced his resignation.

70. There is no rational basis for this differential treatment. Some of the comparator employees received PPP loans of amounts equal to or greater than Mr. Ramsey's combined total. There is no legitimate governmental purpose served by forcing Mr. Ramsey out of his career while permitting comparably situated managers to retain theirs.

71. Defendants' differential and arbitrary treatment of Mr. Ramsey as compared to similarly situated employees was irrational and without any legitimate governmental justification, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. Section 1983.

72. As a direct and proximate result of Defendants' equal protection violations, Mr. Ramsey has suffered the damages described above and is entitled to reinstatement, back pay, compensatory damages, attorney's fees under 42 U.S.C. Section 1988, and all other appropriate relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Anthony Ramsey respectfully requests that this Court:

A.   Enter a declaration that Defendants' conduct violated Mr. Ramsey's rights under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. Section 1983;

B.   Order Mr. Ramsey's immediate reinstatement to his former position as Senior Manager of Rail Station Management, or a comparable position, with full restoration of all seniority, benefits, and rights incident to that employment;

C.   Award Mr. Ramsey back pay in the full amount of compensation and benefits he would have received from the date of his unlawful constructive termination through the date of judgment, with prejudgment interest thereon;

D.   Award Mr. Ramsey compensatory damages for the economic harm he has suffered, including forced pension fund withdrawals, out-of-pocket health insurance costs, and all other economic losses flowing from Defendants' unconstitutional conduct;

E.   Award Mr. Ramsey compensatory damages for the emotional distress, humiliation, and harm to his professional reputation caused by Defendants' conduct;

F.   In the event reinstatement is not ordered or is not practicable, award Mr. Ramsey appropriate front pay to compensate for future lost earnings and benefits;

G.   Award Mr. Ramsey reasonable attorney's fees and costs pursuant to 42 U.S.C. Section 1988; and

H.   Award Mr. Ramsey such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff Anthony Ramsey demands a trial by jury on all issues triable to a jury as a matter of right.

Respectfully submitted,

**DE SILVA LAW OFFICES, LLC**
By: /s/ R Tamara de Silva
**R Tamara de Silva**
110 North Wacker Drive, Suite 2500
Chicago, Illinois 60606
Telephone: (312) 500-8424
tamara@desilvalawoffices.com
ARDC No.: 6244445

**Law Office of Jonathan Lubin**
**By: /s/ Jonathan Lubin**
**Jonathan Lubin**
Address: 8800 Bronx Avenue
Suite 100H
Skokie, IL 60077
Telephone: (773) 945-2608
jonathan@lubinlegal.com

*Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2026, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send the notification of such filing to counsel of record.

By: /s/ *R Tamara de Silva*
R Tamara de Silva (6244445)

21